UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------X

IRENE HUETER,                              **ECF FILING**

              Plaintiff,            **JURY TRIAL DEMANDED**

    -against-                   **COMPLAINT**

BARUCH COLLEGE-THE CITY       **08-CV-7429 (JGK) (RLE)**
UNIVERSITY OF NEW YORK,

              Defendant.
-------------------------------------------------X

Plaintiff, IRENE HUETER, by her attorneys, McLAUGHLIN & STERN, LLP, as and for her COMPLAINT, upon information and belief, alleges the following:

<u>**INTRODUCTION**</u>

This is a civil action for damages and equitable relief instituted pursuant to the provisions of 42 U.S.C. Section 2000e *et seq.* of the Civil Rights Act of 1964, as amended ("Title VII"), the New York State Executive Law, Section 290 *et seq.* (the "New York State Human Rights Law"), and the New York City Administrative Code Section 8-107 *et seq.* (the "New York City Human Rights Law").Plaintiff IRENE HUETER ("Plaintiff" or "DR. HUETER"), an award-winning mathematician, brings this action to redress the discrimination against her in the terms and conditions of her employment on the basis of her gender, in that DR. HUETER's employer, BARUCH COLLEGE-THE CITY UNIVERSITY OF NEW YORK ("Defendant" or "BARUCH") failed to grant her tenure and, ultimately, terminated her on the basis of her gender,

which is female, and subsequently retaliated against her after she complained about the discrimination. Taken together, BARUCH's actions not only negatively impacted the terms and conditions of DR. HUETER's employment at BARUCH, but also ended her academic career.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction of the action pursuant to 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §1343(a)(3) and the principles of pendant jurisdiction pursuant to 28 U.S.C. §1367, in that the unlawful employment practices were committed within this district and the plaintiff would have continued to work within this district but for the unlawful employment practices. In addition, all conditions precedent to jurisdiction under Title VII have been complied with, in that an intake questionnaire and charges of employment discrimination and retaliation were filed with the Equal Employment Opportunity Commission (the "EEOC") within 300 days of the unfair employment practices, and the Plaintiff received notification from the United States Department of Justice, dated June 16, 2008, and June 18, 2008, of her right to sue within 90 days of receipt. A copy of this Complaint is also being filed with the Corporation Counsel of the City of New York and the New York City Commission on Human Rights, pursuant to the New York City Administrative Code, and with the New York State Office of the Attorney General.

2.      Venue properly lies in this judicial district pursuant to 28 U.S.C. §1391(b) and (c) and 42 U.S.C. §2000e-5(3), in that Defendant maintains an office within this judicial district, and a substantial part of the events giving rise to the discrimination have taken place within this judicial district.

3.     Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§2201 and 2202.  An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §§2000e-5k.

## PARTIES

4.     At all relevant times, plaintiff IRENE HUETER was a resident of the State of New York, residing in the City of New York, County of New York.

5.     Upon information and belief, defendant BARUCH COLLEGE of the CITY UNIVERSITY OF NEW YORK is one of the senior colleges within the City University of New York ("CUNY") system.  BARUCH's campus is located in New York County, New York, and, as of April 2008, the school enrolled over 16,000 students in its undergraduate and graduate programs, 52 per cent of whom were women.

## FACTS COMMON TO ALL COUNTS

6.     DR. HUETER is an award-winning mathematician who earned her Masters of Science in Statistics and Actuarial Science in 1989 and her Ph.D. in Statistics and Probability at the University of Berne, Switzerland, in April 1992.  She also completed three postdoctoral fellowships, at Purdue University, the University of Minnesota, and the University of California-Berkeley.

7.     Since being awarded her doctorate, DR. HUETER has received numerous grants and awards, has authored or co-authored 13 different publications in first-rate journals in her field, along with other scientific manuscripts and reports, and has organized, co-organized, and presented papers at numerous scientific conferences and university seminars.

8.      DR. HUETER began her post-doctoral academic teaching and research career in

1994 as a Visiting Assistant Professor of Statistics at the University of California-Berkeley.

Between 1995 and 2002, she served as an Assistant Professor of Mathematics at the University

of Florida, and during this period also served as a Visiting Scholar in the Statistics Departments

of the University of Chicago and Stanford University, and at Princeton University.

9.      In 2001, DR. HUETER was recommended for tenure at the University of Florida,

and was the first person in many years to be unanimously recommended for tenure by that

school's Department of Mathematics.  However, that same year, DR. HUETER came across a

job posting for a "Tenure or Tenure-Track Faculty" position with BARUCH's Department of

Mathematics ("Mathematics Department").  According to the posting, BARUCH was seeking

applicants for "an anticipated tenure-track Assistant/Associate Professor position," to commence

in September 2002.

10.     Of particular interest to DR. HUETER was the notation, in BARUCH's job

posting, that the school was starting a new Masters Program in Applied Mathematics for Finance

("Masters Program") and would give the "highest priority . . . to applicants with expertise in

areas of mathematics related to this specialty" – DR. HUETER's exact research and teaching area

of specialization.

11.     DR. HUETER applied for the advertised position.  During her interviews,

the Chair of BARUCH'S Mathematics Department and the then Dean of BARUCH's Weissman

School of Arts and Sciences (within which the Mathematics Department was located) both

4

emphasized that BARUCH was striving to hire more full-time faculty who could play an active role in research and enhance the academic reputation of the Mathematics Department. The emphasis on excellence in research was repeated during DR. HUETER's interview with the Mathematics Department's Executive Committee, as was the opportunity to teach in the newly-formed Masters Program.

12.    Notably, both the Chair of BARUCH's Mathematics Department and the Department's Executive Committee promised DR. HUETER, who had already served as an Assistant Professor for eight years, that she would not have to wait the normal six years to come up for tenure, but could instead be brought up as early as in her second year at BARUCH.

13.    Based on this representation, DR. HUETER accepted BARUCH's offer and took a position as an Associate Professor. Based on this representation, she also turned down seven other offers of professorship positions at other universities and left the University of Florida before that University could complete her tenure review.

14.    DR. HUETER began teaching at BARUCH in September 2002. At that time, BARUCH's Mathematics Department had only two women among its 20 tenured and tenure-track full-time faculty members, both of whom were granted tenure many years ago. During DR. HUETER's time at BARUCH, the Mathematics Department hired a few women into full-time tenure-track positions, but did not grant any women tenure, and indeed, discouraged one woman from applying for tenure. By contrast, between 2002 and 2005, the Mathematics Department granted early tenure to one male colleague of DR. HUETER's who was significantly junior to

5

DR. HUETER and who had weaker professional credentials than hers. Moreover, during that same period, the Mathematics Department promoted from Associate Professor to full Professor two other male colleagues of DR. HUETER's, both of whom had weaker professional credentials than hers. All of this is so even though over 50 per cent of the students in BARUCH's mathematics classes were female.

15.    While at BARUCH, DR. HUETER wrote more than a dozen research papers, including one that outlined a solution to a mathematical problem that had defied solution for nearly a century. She won three PSC-CUNY research awards from the CUNY Research Foundation and two CUNY Faculty Development Program Proposal Awards, collaborated on a major conference grant awarded by the National Science Foundation, founded and organized an international research conference at the CUNY Graduate Center, organized a Probability Seminar that brought together faculty from throughout the CUNY system, presented a string of invited lectures at other universities and at conferences throughout the United States and Europe, and, generally, compiled a strong record of service to the Mathematics Department, BARUCH, and CUNY generally.

16.    Students found DR. HUETER to be an excellent teacher. DR. HUETER's student evaluation scores in the upper-level courses she taught were exceptionally high, and her scores in the elementary-level introductory courses fell within the range that most of the other Mathematics Department professors scored for those courses.

17.     Indeed, it was common for BARUCH professors to garner higher student evaluation scores in upper-level courses, which were comprised of students who chose such courses and tended to earn higher grades.  In contrast, as a general matter, BARUCH professors garnered lower student evaluation scores in those entry-level courses in which students had to take uniform, Department-wide final examinations, which many students failed, thus failing the course.  Notwithstanding this, however, 100 per cent of DR. HUETER's entry-level Applied Calculus students passed the Department-wide final examination for the 2005-2006 academic years, a testament to DR. HUETER's teaching abilities.

18.     Despite DR. HUETER's high student evaluation scores in upper-level courses, BARUCH repeatedly denied DR. HUETER the opportunity to teach upper-level courses and instead assigned her a heavy load of entry-level courses, and did so based on DR. HUETER's gender.  BARUCH's procedure for assigning courses involved canvassing faculty members about their course preferences and then balancing these preferences with Departmental needs.  Yet in the three academic years between 2003 and 2006, DR. HUETER was assigned to teach only one course from her preference list.  Instead, she was disproportionately assigned to teach the very entry-level courses that students traditionally rated the lowest, while male professors with lesser qualifications were assigned to teach the upper-level courses that students tended to rank higher.  As well, in comparing DR. HUETER to the other, mostly male, members of the Mathematics Department, BARUCH compared DR. HUETER's teaching scores from her undergraduate, entry-level courses against her colleagues' teaching scores in the graduate-level Masters Program

– in essence, comparing apples to oranges – to create the impression that DR. HUETER's teaching was not as good as it actually was.

19.    Strikingly, DR. HUETER was never even assigned to teach one course in the very Masters Program that she had been hired to teach in.  This was notwithstanding the fact that the brochure advertising the new Masters Program listed her as one of the Program's ten faculty members (only one other of whom was female).  By contrast, male faculty members were afforded numerous opportunities to teach in both the new Masters Program and other advanced-level courses that were not offered to DR. HUETER.  Indeed, on one occasion, an advanced course on Graph Theory that had been assigned to DR. HUETER was taken away from her and given to a more junior male faculty member after he complained about not being able to teach the course.

20.    In addition to her favorable student reviews, DR. HUETER received favorable teaching reviews from fellow faculty members when they conducted peer evaluation reviews. These reviews, which took place each semester, were generally conducted by colleagues of equal or higher rank from within the Mathematics Department.

21.    In the late Winter of 2003-04, DR. HUETER was invited by CUNY to enter a University-wide competition to teach a course in Probability at the CUNY Graduate Center. After receiving written permission in March 2004 from the Chair of BARUCH's Mathematics Department to teach the course in the Fall of 2004, DR. HUETER entered the competition.

22.    In August 2004, DR. HUETER won the competition and prepared to teach the CUNY Graduate Center course. However, just days before the class was to commence, BARUCH's Mathematics Department Chair asked her to cancel the class. DR. HUETER declined to do so on grounds that canceling at the last minute would be unprofessional and irresponsible, as her course had been chosen over approximately a dozen others by the CUNY Graduate Center. The Chair then asked DR. HUETER to teach an additional entry-level Precalculus course at BARUCH.

23.    However, in addition to winning the competition to teach at the CUNY Graduate Center, DR. HUETER had also already won a "buyout" research grant for the Fall 2004 semester. By the terms of such a grant, a faculty member is awarded a grant to conduct research, and his or her department receives the funds from the grant to put toward hiring someone else to teach that faculty member's class. Accordingly, DR. HUETER declined to teach the Precalculus course because, by the terms of her buyout research grant, she was exempted from teaching courses at BARUCH during the Fall 2004 semester, and instead was to be focusing on her research, while BARUCH was to receive the money she would have otherwise received in order to hire someone else to teach that course.

24.    In response, the Chair of the Mathematics Department advised DR. HUETER that she should refuse to teach the CUNY Graduate Center course rather than the Precalculus course, and insisted that DR. HUETER sign a letter stating that, contrary to his advice, she had requested that she not teach Precalculus in the Fall of 2004 as originally scheduled.

25.     In making DR. HUETER choose between fulfilling her obligation to the CUNY Graduate Center, which the BARUCH Mathematics Department Chair had already approved, and teaching the Precalculus course, which DR. HUETER was not supposed to be teaching because of her buyout research grant, the Chair set the stage for later events by ensuring that DR. HUETER would have a record of refusing to teach BARUCH courses, contrary to his wishes.

26.     Upon information and belief, no male Mathematics Department professors who had been awarded buyout research grants were then asked to teach the courses they had won exemptions from teaching, and no male professors were rebuked or punished for making or keeping a non-BARUCH teaching commitment made with the Mathematics Department Chair's prior written permission.

27.     At around the same time that DR. HUETER was seeking the Chair's approval to apply for the CUNY-wide competition, several of her male colleagues began to make remarks to her about her chances for obtaining tenure.  Specifically, in the Winter of 2004, the Chair of the Mathematics Department and other male colleagues commented that she was doing too much research and "did not fit in" within BARUCH's Mathematics Department, notwithstanding the fact that she was told at the time of her hire that she was being hired to enhance BARUCH's research and academic reputation.

28.     Shortly thereafter, the Chair selected an older male professor, who had not been active in research mathematics for nearly three decades, to conduct a peer evaluation of DR. HUETER.  This was unusual since the older male professor had, just one semester previously,

10

conducted a peer review of DR. HUETER, and faculty are rarely selected to evaluate someone

more than once. Yet unlike his previous, favorable review of DR. HUETER, which took place

before DR. HUETER won the CUNY-wide competition, this time, the older male professor gave

DR. HUETER an Unsatisfactory rating.

29.    DR. HUETER's Spring 2004 peer evaluation, which was markedly different than

her favorable Fall 2003 peer evaluation (despite the fact that the evaluations were conducted by

the same colleague), contained numerous errors.

30.    In March 2004, DR. HUETER submitted a lengthy response to the flawed Spring

2004 peer evaluation, pointing out the clear errors in the assessment of her teaching. As a result,

in April 2004, the Mathematics Department sent a different male faculty member, to reevaluate

DR. HUETER's performance in the same class. This performance review of just one month later

was overwhelmingly positive. Specifically, DR. HUETER's teaching was rated as "Good" in 21

of 24 categories, suggesting improvement in only one category, and noting that the final two

categories did not apply. The review noted that DR. HUETER's students seemed "Interested" in

the subject matter and had a "Friendly" attitude toward DR. HUETER, and gave her an overall

"Satisfactory" rating (with the choices being "Satisfactory" or "Unsatisfactory").

31.    In the Summer of 2004, around the time the Chair asked DR. HUETER to cancel

her CUNY Graduate Center course, DR. HUETER inquired about coming up for tenure or

promotion in the Fall of 2004. The Chair replied that the Mathematics Department would not

support her application.

32.    At the same time, a male professor significantly junior to DR. HUETER, was allowed to apply for tenure.  Both DR. HUETER and the male professor began teaching at BARUCH during the 2002-2003 academic year and, by the Summer of 2004, each had taught at BARUCH for two continuous years.  However, unlike DR. HUETER, who had taught as a full-time faculty member at the University of Florida for seven years prior to coming to BARUCH, the junior male professor had never taught as a full-time faculty member prior to BARUCH.  Moreover, at that time, DR. HUETER, who earned her Ph.D. seven years prior to the male professor, had twelve journal publications listed to her name by MathSciNet, the search engine most commonly used in academia in mathematics, while the junior male professor had only six.

33.    In December 2004, BARUCH's Mathematics Department completed a favorable review of DR. HUETER.

34.    The following semester, by prearrangement, BARUCH granted DR. HUETER unpaid leave to teach at the University of Massachusetts in Boston ("UMB") for the Spring 2005 semester.  Shortly before her departure, the Dean of BARUCH's Weissman School of Arts and Sciences (of which the Mathematics Department was a part), told DR. HUETER that she would be brought up for tenure immediately upon her return from Boston.  Based on this promise, DR. HUETER returned to teach at BARUCH in the Fall of 2005, turning down an Associate Professor position at UMB.

35.    However, upon returning to BARUCH in September 2005, DR. HUETER learned that the Mathematics Department's Executive Committee had voted to not reappoint her, thereby

terminating her, effective after the 2005-2006 academic year. In so doing, BARUCH effectively ended DR. HUETER's career prospects in academia.

36.    At the same meeting at which the Mathematics Department Executive Committee voted to terminate DR. HUETER, it also voted to reappoint a male faculty member who had been on unpaid leave for two years. Indeed, several years prior, the Mathematics Department Executive Committee voted to reappoint a different male faculty member, who had also been on unpaid leave, to his former position.

37.    In October 2005, BARUCH again conducted a purported "peer" evaluation of DR. HUETER. However, the purported "peer" who was sent by the Mathematics Department was not a peer of DR. HUETER's at all, in that he was neither a Professor, an Associate Professor, nor even an Assistant Professor. Rather, he was simply a Lecturer, who lacked a Ph.D. Since at least 2002, no male full-time faculty members in the Mathematics Department had ever been observed by a non-peer Lecturer.

38.    DR. HUETER appealed the Executive Committee's decision to terminate her, and, in December 2005, her appeal was sustained by BARUCH's School Academic Review Committee ("SARC"). However, BARUCH's Personnel and Budget Committee ("PBC") overturned the December 2005 decision of the SARC at a meeting at which DR. HUETER was denied representation, and, in March 2006, BARUCH's President ratified the PBC's decision. The PBC had previously declined to reverse a similar judgment in favor of a male Mathematics Department Professor who had also successfully appealed his non-tenure decision.

13

39.    In March 2006, after the PBC overturned DR. HUETER's successful appeal and the President ratified this decision, the Mathematics Department sent a male faculty member to conduct one final peer review of DR. HUETER. The faculty member, who had previously given DR. HUETER a positive Satisfactory review, now gave her an Unsatisfactory review. Moreover, throughout his entire written report, the male reviewer was demeaning to DR. HUETER, by, for example, repeatedly referring to her as "Ms. Hueter" rather than "Dr. Hueter," even though he knew that she, like he, had a doctorate degree and that it is customary in the academic world for colleagues to refer to one another as "Dr." or "Professor" if one has a Ph.D. or is a Professor.

40.    Notably, at a subsequent meeting to discuss the March 2006 review, attended by the Mathematics Department Chair, DR. HUETER, and the faculty member who conducted the review, the Chair, who had a copy of the written report, neither corrected the faculty member regarding his repeated use of the reference "Ms. Hueter" nor took any note of the demeaning reference.

41.    On March 19, 2006, DR. HUETER presented her claim of discrimination against BARUCH to the EEOC. Prior to doing so, DR. HUETER complained to BARUCH officials that she believed she had been discriminatorily refused tenure and terminated because of her gender. After filing her claim with the EEOC, DR. HUETER informed BARUCH that she had taken such action.

42.    BARUCH in turn retaliated against DR. HUETER for taking such action by making false and derogatory statements about her, discrediting her professional reputation, and

interfering with her ability to obtain a tenure or tenure-track position at other universities, thereby effectively ending her career in academia.

43.    DR. HUETER applied for numerous positions at other universities and colleges for the 2006-07 academic year.  In contrast to when DR. HUETER had searched for employment prior to coming to BARUCH and had received eight offers of employment for tenure-track positions at research universities, she now did not receive any offers of employment for tenure-track positions.

44.    On May 29, 2006, DR. HUETER applied to CUNY's City College ("City College") for an Associate Professor position in the City College Mathematics Department.  The then Chair of the City College Mathematics Department informed DR. HUETER that he had already spoken with his departmental colleagues about her application and further informed her in June 2006 that he hoped to make a decision within the next few weeks.

45.    In July 2006, the new Chair of City College's Mathematics Department contacted DR. HUETER.  She told DR. HUETER that the department had strongly supported DR. HUETER's candidacy and had forwarded DR. HUETER's name to City College's higher administration, which, in turn, had called BARUCH to inquire about DR. HUETER.  BARUCH had falsely responded that DR. HUETER had been terminated because of problems with her teaching.  The new Chair of City College's Mathematics Department told DR. HUETER that, as a result of the statements by BARUCH about DR. HUETER, City College's higher administration would not let the City College Mathematics Department hire DR. HUETER, even

15

though the department wanted to.

46.     DR. HUETER also applied to CUNY's Borough of Manhattan Community
College ("BMCC") in February 2006 for an Associate Professor position.  In May 2006, DR.
HUETER had a positive first interview with the BMCC Mathematics Department and met
several members of the BMCC Search Committee.  After DR. HUETER's name was forwarded
to BMCC's higher administration and she was recommended for a position, she went for a
second interview in June 2006, with the BMCC Vice President, Academic Affairs.  At the
interview, the Vice President stated that she knew some people at BARUCH and was going to
contact them to inquire about DR. HUETER.  Several weeks later, DR. HUETER received a
written notice stating that she was not being offered a position at BMCC.

### AS AND FOR A FIRST CLAIM OF RELIEF
### (Under Title VII)

47.     Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1
through 46, as if set forth in full herein.

48.     BARUCH'S decisions to terminate DR. HUETER from her position as Associate
Professor and to fail to consider her for or grant her tenure were based on DR. HUETER's gender
and were in violation of DR. HUETER's federally protected rights under Title VII, in that male
professors with lesser experience and credentials were granted tenure and were not terminated.
BARUCH's failure to grant DR. HUETER tenure, and its decision to terminate DR. HUETER,
was part of the pattern of discrimination against women in BARUCH's Mathematics Department,
the result of which was that women were treated and evaluated in ways different than men and

16

were not allowed to teach higher level courses or to teach in the Masters Program, while male professors were allowed to do so.

49.     BARUCH's interference with DR. HUETER's search for subsequent employment at other universities was in retaliation for DR. HUETER's having exercised her rights under Title VII and having complained about gender discrimination.

50.     BARUCH's conduct was intentional, malicious and in reckless disregard of DR. HUETER's protected rights under the federal civil rights laws.

51.     As a result of BARUCH's discrimination and retaliation against DR. HUETER, she has lost her employment, her ability to obtain a tenured position at another university, and her career prospects, and has suffered severe economic and other injury.

52.     By reason of the foregoing, BARUCH has violated Title VII of the Civil Rights Act and DR. HUETER is entitled to the following relief:

(a)     economic damages in the amount of not less than One Million ($1,000,000.00) Dollars;

(b)     compensatory and punitive damages in the amount permitted by statute; and

(c)     attorneys' and expert fees in an amount not presently capable of ascertainment.

## AS AND FOR A SECOND CLAIM FOR RELIEF
**(Under the New York State Human Rights Law)**

53.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 52, as if set forth in full herein.

54.    BARUCH'S decision to terminate DR. HUETER from her position as Associate Professor and to fail to consider or grant her tenure was based on DR. HUETER's gender and was in violation of her protected rights under New York State law, in that male professors with lesser experience and credentials were granted tenure and were not terminated.  BARUCH's failure to grant DR. HUETER tenure, and its decision to terminate DR. HUETER, was part of the pattern of discrimination against women in BARUCH's Mathematics Department, the result of which was that women were treated and evaluated in ways different than men and were not allowed to teach higher level courses or to teach in the Masters Program, while male professors were allowed to do so.

55.    BARUCH's interference with DR. HUETER's search for subsequent employment at other universities was in retaliation for DR. HUETER's having exercised her rights under New York state law and having complained about gender discrimination.

56.    BARUCH's conduct was intentional, malicious and in reckless disregard of plaintiff's protected rights under the state civil rights laws.

57.    As a result of BARUCH's discrimination and retaliation against DR. HUETER, she has lost her employment, her ability to obtain a tenured position at another university, and her career prospects, and has suffered severe economic and other injury.

18

58.    By reason of the foregoing, BARUCH has violated the New York State Human

Rights Law and plaintiff is entitled to the following relief:

(a)    economic damages in the amount of not less than One Million

($1,000,000.00) Dollars; and

(b)    compensatory damages in the amount of not less than Five Hundred

Thousand ($500,000.00) Dollars.

### AS AND FOR A THIRD CLAIM FOR RELIEF
#### (Under the New York City Human Rights Law)

59.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1

through 58, as set forth in full herein.

60.    BARUCH'S decision to terminate DR. HUETER from her position as Associate

Professor and to fail to consider or grant her tenure was based on DR. HUETER's gender and

was in violation of DR. HUETER's protected rights under the New York City Human Rights

Law, in that male professors with lesser experience and credentials were granted tenure and were

not terminated.  BARUCH's failure to grant DR. HUETER tenure, and its decision to terminate

DR. HUETER, was part of the pattern of discrimination against women in BARUCH's

Mathematics Department, the result of which was that women were treated and evaluated in

ways different than men and were not allowed to teach higher level courses or to teach in the

Masters Program, while male professors were allowed to do so.

61.    BARUCH's interference with DR. HUETER's search for subsequent employment

at other universities was in retaliation for DR. HUETER having exercised her rights under New

York City law and having complained about gender discrimination.

62.    BARUCH's conduct was intentional, malicious and in reckless disregard of DR.

HUETER's protected rights under New York City law.

63.    As a result of BARUCH's discrimination and retaliation against DR. HUETER,

she has lost her employment, her ability to obtain a tenured position at another university, and her

career prospects, and has suffered severe economic and other injury.

64.    By reason of the foregoing, BARUCH has violated the New York City Human

Rights Law and DR. HUETER is entitled to the following relief:

(a)    economic damages in the amount of not less than One Million

($1,000,000.00) Dollars;

(b)    compensatory damages in the amount of not less than Five Hundred

Thousand ($500,000.00) Dollars;

(c)    punitive damages in the amount of not less than One Million

($1,000,000.00) Dollars; and

(c)    attorneys' and expert fees in an amount not presently capable of

ascertainment.

WHEREFORE, plaintiff requests that this Court issue a judgment granting the following relief to plaintiff:

1.    Issuing a declaratory judgment finding as follows:

(a)    Defendant has violated the provisions of 42 U.S.C. Section 2000e, *et seq.*;

(b)    Defendant has violated the provisions of the New York Executive Law, Section 290 *et seq.*; and

(c)    Defendant has violated the provisions of the New York City Administrative Code Section 8-107 *et seq.*

2.    Awarding plaintiff damages as follows:

### ON THE FIRST COUNT

(a)    economic damages in the amount of not less than One Million ($1,000,000.00) Dollars;

(b)    compensatory and punitive damages in the amount permitted by statute; and

(c)    attorneys' and expert fees in an amount not presently capable of ascertainment.

### ON THE SECOND COUNT

(a)    economic damages in the amount of not less than One Million ($1,000,000.00) Dollars; and

(b)    compensatory damages in the amount of not less than Five Hundred

Thousand ($500,000.00) Dollars.

## ON THE THIRD COUNT

(a)    economic damages in the amount of not less than One Million

($1,000,000.00) Dollars;

(b)    compensatory damages in the amount of not less than Five Hundred

Thousand ($500,000.00) Dollars;

(c)    punitive damages in the amount of not less than One Million

($1,000,000.00) Dollars; and

(d)    attorneys' and expert fees in an amount not presently capable of

ascertainment.

3.    Granting such other and further relief as the Court may deem just, proper and

equitable.

Dated: New York, New York
       August 21, 2008

McLAUGHLIN & STERN, LLP


By:_____
   Steven J. Hyman (SH #2097)
   Deanna R. Waldron (DW #2611)
   Aimee E. Saginaw (AS #2788)
   Attorneys for Plaintiff
   260 Madison Avenue
   New York, NY 10016
   (212) 448-1100

22

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Case No.

-----------------------------------X

IRENE HUETER,

Plaintiff,

-- against --

BARUCH COLLEGE-THE CITY UNIVERSITY
OF NEW YORK,

Defendant.

-----------------------------------X

## SUMMONS AND COMPLAINT

**McLAUGHLIN & STERN, LLP**
**260 MADISON AVENUE**
**NEW YORK, NEW YORK 10016**
*Attorneys for Plaintiff Irene Hueter*

Telephone (212) 448-1100
Facsimile (212) 448-0066